**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **THELMARAE W.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 17 C 4709** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **ANDREW SAUL, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

This case is a poster child for the bureaucratic and judicial complexities of Social Security

disability cases. Incredibly, this case is *over a decade old* as the plaintiff first applied for Disability

Insurance Benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§416(i), 423, on

September 16, 2009. (Administrative Record (R.) 174-75). She claimed that she became disabled

as of February 6, 2009, due to sleep apnea, diabetes, COPD, chronic back pain, depression, thyroid

disease, restless leg syndrome, and sinusitis. (R. 210). Over the next three years, plaintiff's

application was denied at every level of administrative review: initial, reconsideration, administrative

law judge (ALJ), and appeals council. The plaintiff sought review of the denial in federal district

court, filing suit in July of 2013. [13-cv-4998]. Briefing took nine months [13-4998, Dkt. # 28], and

about a year later, the magistrate judge remanded the case back to the Commissioner on March 26,

2015. [13-4998, Dkt. ##36, 37]. While those six years were passing, the plaintiff filed another

_____

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the
Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and
the first initial of their last name.

application for disability benefits, this time for Supplemental Security Income, and this time an ALJ found her disabled as of August 27, 2013. (R. 1069). At that point, she had changed age categories to "closely approaching advanced age," and based on a capacity for sedentary work she was found disabled under the Medical Vocational Guidelines. (R. 1069).

Meanwhile, the remanded case went through the same administrative process again, again with denials at every level, and plaintiff was back in federal district court on June 23, 2017. Plaintiff filed her motion for reversal of the denial on December 7, 2017 [Dkt. #16], and the matter was fully briefed over two years ago, as of April 6, 2018. [Dkt. # 26]. Along the way, the case bounced among four separate district court judges. [Dkt. ## 5, 19, 20, 32]. After a little over two years of that, the case was reassigned to me on May 19, 2020. [Dkt. #43]. And, once again, as seven years earlier, the plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## ARGUMENT

### A.

Plaintiff was born on February 28, 1964, and so was just about 45 at the time she claims she became unable to work in 2009. (R. 207, 210). She last worked steadily from 2001-2005, mostly as a cashier at convenience stores like 7 Eleven. (R. 185, 243). She was fired from her last job for playing instant lottery tickets during her shift. (R. 211). For the purpose of receiving Disability Insurance Benefits, her insured status expired March 31, 2011 (R. 184), so we have to concern ourselves with evidence of plaintiff's condition a decade ago.

2

The record in this case is 1200 pages long, and although there are really only a couple of years at issue, the medical evidence covers nearly 650 pages. (R. 280-923). So, the plaintiff went to the doctor a lot. It is sometimes said that a claimant has a "constellation" of problems; the plaintiff has a galaxy. They range from what most people would regard as nuisances, like sinusitis, allergies, and restless leg syndrome, to sleep apnea, obesity, depression, COPD, emphysema, diabetes, and degenerative arthritis in her back and neck.

Her main issue that prevented her from working was fatigue from sleep apnea. (R. 57, 60). When she used her CPAP machine, she was able to sleep "five to six, seven hours" a night. (R. 59). When her allergies or sinusitis were exacerbated, however, she might go a week or two at a time when she was unable to use it. (R. 59). Due to her back and leg pain, she couldn't be on her feet all day; when there were no customers she would sit in the office. (R. 60). She had those problems since she was nine and was hit by a car. (R. 64).

Plaintiff saw a pain management specialist, Dr. Ungar, about once a month, and was treated with medication and injections a couple of times. (R. 63, 65). Plaintiff rented a room from her boyfriend, who was receiving Supplemental Security Income. (R. 69). Her daughter and her three young children also lived with them. (R. 68-69). In 2010, she babysat for them from four to nine hours everyday, with some help from other daughters. (R. 72). She occasionally went shopping with her boyfriend, but spent most of her time watching TV. (R.75). She continued to smoke, she said about a pack a day; she would "smoke off [her] kids, smoke off [her] boyfriend." (R. 93-94). At other points in the record she admitted to her doctors that it was more like 2-3 packs a day. (R. 628, 914). She had a cigarette right before her administrative hearing. (R. 94). Despite medical advice, she did not want to stop. (R. 563, 604, 914).

3

Essentially, the record depicts a person who is, in regard to nearly all her issues, her own worst enemy. Of course, her respiratory issues are tied to her continued smoking; so is her sleep apnea. (R. 604, 701, 705). She is obese, 4'10" and has weighed as much as 204 pounds during the pertinent period. (R. 209, 628). Her obesity also adversely affects her sleep, as well as poor sleep habits, and doctors had advised her to lose weight. (R. 603-05, 620, 624). Keeping a cat despite medical advice also triggers her allergies, breathing issues and, again, contributes to sleep difficulties, and doctors repeatedly advised against that as well. (R. 562, 563, 606 871).

Despite all that, clinical exams and test were generally unremarkable. Oxyhemoglobin was repeatedly good, 92-96%. (R. 562, 602, 610). Respiration was normal and unlabored. (R. 562). Plaintiff herself said she could walk two to three blocks, stand for 45 minutes, and sit for four to five hours a day. (R. 585). In February 2010, straight leg raising was negative, gait normal, flexion limited to 60 degrees of 90 due to pain. (R. 587). CT scan of the lumbar spine in December 2010 was normal at all levels aside from mild degenerative changes. (R. 838). Cervical spine study reveal a mild disc bulge at C4-5, but no stenosis or nerve involvement. (R. 839). Straight leg raising was positive at 60 degrees in April 2011. (R. 818).

In December 2009, a consultative psychological examination revealed judgment, insight, functioning, reasoning to all be normal; mood was appropriate. (R. 544-45). GAF score was 66. (R, 545). Exam was essentially normal functionally again on June 14, 2011 and June 30, 2011; mood was pleasant. (R. 905, 914). GAF score was 50-55 (R. 905, 911).

After an administrative hearing – at which plaintiff, represented by counsel, a vocational expert, and a psychologist testified – the ALJ crafted a lengthy, thorough, and well-reasoned opinion, determining plaintiff was not disabled prior to the expiration of her insured status. The

4

ALJ found that plaintiff had the severe impairment of obstructive sleep apnea, diabetes mellitus, obesity, asthma with a history of emphysema and a mild obstructive ventilatory defect as well as acute episodes of bronchitis and sinusitis, degenerative changes to the lumbar spine with chronic lumbar radiculopathy, (R. 930). Plaintiff also had over a dozen non-severe impairments, including depressive anxiety disorder, hyperlipidemia, thyroid dysfunction, restless leg syndrome, migraines, jaw dysfunction, cervical spinal arthritis, and a handful of gastrointestinal impairments. (R. 930). The ALJ determined that plaintiff's impairment caused no more than mild limitations in understanding, remembering, or applying information; a moderate limitation in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. (R. 930-33). The ALJ then found that the plaintiff's impairments, either singly or in combination, did not meet or equal a listed impairment assumed to be disabling in the Commissioner's listings. (R. 938). Specifically, the ALJ considered Listing 3.00(2) for sleep apnea, Listing 12.02 for depression, Listing 9.00 for diabetes, Listings 3.02 and 3.03 for diabetes, and Listing 1.04 for degenerative spinal changes. (R. 938-39).

The ALJ then stated that the plaintiff had the residual functional capacity to perform a full range of sedentary work (R. 939), which:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 CFR §. 404.1567(a). In so finding, she engaged in a lengthy review of the medical record and plaintiff's subjective complaints. (R. 939-46). The ALJ next found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however,

[her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." (R. 940). The ALJ offered a litany of reasons for finding plaintiff's allegations exaggerated. Despite her many respiratory complaints, and despite medical advice, she continued to smoke and did not avoid known triggers to her allergies. (R. 940). She discontinued use of Advair because she felt it wasn't helping. (R. 940). Her impairments were long-standing, and she had worked despite them prior to her alleged onset date. (R940-41). She claimed she forewent some medications due to cost, but had funds for more than a pack of cigarettes per day. (R. 941). She was able to provide constant care for her boyfriend's invalid mother. (R. 942). She didn't use her CPAP machine because of her sinusitis, which was a result of her continued smoking. (R. 943). Allegations regarding plaintiff's diabetes and degenerative disc disease were not consistent with the objective medical evidence. (R. 944-45).

The ALJ also assessed the medical opinion evidence. She gave little weight to the state agency reviewing physician, who thought plaintiff could do medium work. She accepted the opinion of the state agency reviewing psychologist who found plaintiff's psychological impairment to be non-severe. The ALJ rejected the opinion of one of plaintiff's treating physicians that fatigue due to sleep apnea was such that she could not drive, and that she could not perform any level of work, as this conflicted with treatment notes and plaintiff's report of her activities. And, finally, the ALJ rejected the opinion of the plaintiff's other treating physician that plaintiff was extremely limited in all facets of exertional, postural, and environmental aspects as inconsistent with the doctor's records, and the medical evidence, and because the doctor only began treating plaintiff in late 2010. (R. 945-46).

Next, the ALJ determined that plaintiff could not return to her past work because it was performed at the light exertional level, and plaintiff was limited to sedentary work. (R. 946-47). Then, the ALJ consulted the Medical-Vocational Guidelines and to find that, based on plaintiff's age, education, and work experience, there were a significant number of sedentary jobs she could perform. Accordingly, the ALJ found the plaintiff was not disabled prior to the expiration of her insured status.

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017)

But, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's

reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)("The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge might have reached the same result had she considered all the evidence and evaluated it as the government's brief does, it is a case of harmless error. But the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion."). But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).

## III.

In addition to multiple administrative hearings, multiple trips to federal district court and reassignments of the case once there, and a voluminous and disorganized record, no doubt, a not insubstantial part of the reason for how long it has sat fully-briefed is the plaintiff's decision to file

a kitchen-sink brief, nearly twice as long as the standard. It assigns, by this court's count, about twenty separate errors requiring the court to overturn the ALJ's opinion. The Seventh Circuit has frequently criticized this type of brief-writing, *see Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 513 (7th Cir. 2011); *United States v. Pearson*, 340 F.3d 459, 464 (7th Cir. 2003); *United States v. Evans*, 92 F.3d 540, 546 (7th Cir. 1996) calling it, variously, "the equivalent of a laser light show of claims may be so distracting as to disturb our vision and confound our analysis." *United States v. Lathrop*, 634 F.3d 931, 936 (7th Cir.2011) (collecting cases); a "scattergun approach [that] generally does not serve [clients] well, *Cole v. Comm'r*, 637 F.3d 767, 772 (7th Cir.2011); or a "kitchen sink approach to briefing [that] cause[s] distraction and confusion, [and] also consumes space that should be devoted to developing the arguments with some promise." *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000). *See also* Matthew Kennelly, *Over-Arguing Your Case*, 40 LITIGATION 41 (Winter 2014).[2] A brief only half that here once caused the Sixth Circuit to remark that "[w]hen a party comes to us with nine grounds for reversing the [lower court's decision], that usually means there are none." *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012). All this is not to say that an ALJ could not possibly have made so very many errors; it is to say that just because there a lot of capillaries, there is no need to hack at each and every one with a butter knife. A focused, surgical approach works best.

As a perfect example of how the plaintiff's approach can scuttle a case, there is the very first argument plaintiff advances. She claims the ALJ legally erred by failing to require the vocational

---

[2] *See also Pierce v. Visteon Corp.*, 791 F.3d 782, 788 (7th Cir. 2015); *United States v. Stokes*, 726 F.3d 880, 887 (7th Cir. 2013); *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 513 (7th Cir. 2011); *United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001); *Pitsonbarger v. Gramley*, 141 F.3d 728, 734 (7th Cir. 1998); *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir. 1993).

expert to provide the documentation he relied upon for his estimates of job numbers. [Dkt. # 16, at 7-8]. But, the case plaintiff relies, *McKinnie v. Barnhart*, 368 F.3d 907 (7th Cir. 2004), was overturned in *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), after the plaintiff filed her brief and the court was sifting through her twenty arguments. More importantly, however, case overturned or not, the point plaintiff tries to make is irrelevant. The ALJ did not rely on any numbers from the vocational expert in finding the plaintiff was not disabled. (R. 947). So, right off the bat, the plaintiff is wasting space and the court's time with an argument that is not even based on the record and, again, this is why the "kitchen sink" method is disfavored.

Next, the plaintiff argues that, because the ALJ rejected plaintiff's subjective complaints because they were, as the ALJ said, " not entirely consistent" with the evidence, that is legal error to apply a preponderance standard, not a clear and convincing standard to the assessment of her allegations. [Dkt. #16, at 8]. The "not entirely consistent" language is common boilerplate in most ALJ decisions and, like most common boilerplate, is essentially meaningless to a court charged with reviewing the ALJ's reasoning. *See, e.g., Dunn v. Saul*, 794 F. App'x 519, 523 (7th Cir. 2019). But, courts have generally rejected the argument that use of the phrase is fatal, concerning themselves with whether the ALJ gave an account of his reasons for disbelieving the plaintiff's complaints. *See, e.g., Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013); *Karla J.B. v. Saul*, 2020 WL 3050220, at *6 (N.D. Ill. 2020)(collecting cases). As the review of the ALJ's decision reveals, the ALJ provided numerous reasons for discounted plaintiff's allegations. Indeed, the plaintiff herself submits that the ALJ provided reasons for rejecting her allegations and discussed them at length [Dkt. # 16, at 8-17], so her boilerplate argument, based on a misreading of the record and neglect of the foregoing case law, could have easily been skipped.

10

The plaintiff next finds fault with the ALJ addressing her impairments generally and not specifying which limitations were not accepted and why, specifically her respiratory impairments and her lumbar degenerative changes. [Dkt. #16, at 8-9]. The argument is brief and skeletal and, more importantly, plaintiff does not explain what more she wants; nor does she provide any example of what she thinks the ALJ actually missed. An ALJ's credibility findings need not specify which statements were not credible. *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003). Arguments like these might be acceptable if the ALJ's decision were sketchy or superficial, but what we have here is a very thorough breaking down of plaintiff's allegations about each of her impairments.

Importantly, this is not a case where the ALJ simply said that "statements about the individual's symptoms are (or are not) supported or consistent" with the record. SSR 16-3p, 2016 WL 1119029, at *9. Instead, she "explain[ed] which aspects of [plaintiff]'s testimony [s]he rejected and why. *See Dunn v. Saul*, 794 F. App'x 519, 523 (7th Cir. 2019). For example, the ALJ noted plaintiff's complaints of fatigue, shortness of breath, coughing, and wheezing stemming from her respiratory impairmets, and found they were exaggerated. Specifically, the ALJ pointed to the facts that her respiratory impairments were long-standing, that she ignored medical advice regarding ways to control or minimize them on multiple levels, and when exacerbations did occur, they were rare and responded to treatment. (R. 940-43). The ALJ was similarly thorough and specific with the plaintiff's allegations regarding her lower back pain. This impairment started when she was a child; objective testing showed at most mild degenerative changes, examinations were generally unremarkable, and treatment was exceedingly conservative. (R. 944-45). The ALJ explained that she was discounting plaintiff's complaints to the extent they were inconsistent with performing a job

11

that one could do sitting all day. (R. 945).

The ALJ addressed each impairment and attendant claims in this manner (R. 940-45), and the court simply cannot accept that there was something more the ALJ had to do to provide a logical bridge from the evidence to her rejection of the intensity, persistence, and limiting effects of plaintiff's impairments. This is not, as plaintiff seems to want the court to believe, an opinion where the ALJ's rejection of plaintiff's allegations "is suspended over air." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). The ALJ's analysis was anything but "scant." *Cf. Plessinger v. Berryhill*, 900 F.3d 909, 917 (7th Cir. 2018); *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015). Six single-spaced pages sifting through a plaintiff's complaints and assessing them carefully against the record is not "air."

As if to prove this, despite arguing that the ALJ failed to adequately address her complaints, plaintiff next critiques every reason the ALJ did give for rejecting her complaints. She spends nearly ten pages recounting, discussing, and rejecting the ALJ's reasoning (R. 9-17), which certainly undermines her claim that the ALJ's decision was not thorough enough to allow meaningful review. Meaningful review means that an ALJ has adequately articulated her analysis so that the court can follow her reasoning. *Minnick*, 775 F.3d at 938. The court can follow the ALJ's reasoning. As the foregoing discussion – and some of the ensuing discussion – shows, it is the plaintiff's reasoning that presents a challenge.

"We may disturb the ALJ's credibility finding only if it is 'patently wrong.' " *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). The ALJ's assessment of a plaintiff's allegations need not be perfect. *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). The point is that the ALJ must discuss the allegations and assess them

12

in light of the other evidence. If the ALJ rejects them, the reasoning must be logical. The ALJ did that here, offering reason after reason for her finding that the plaintiff was exaggerating her symptoms.

Plaintiff first attacks the ALJ for noting that her impairments were long-standing and, as she had worked despite them in the past, her claim that she could not work at all was exaggerated. (R. 942, 944-45). But, "[e]vidence that [a plaintiff's] impairment did not interfere with h[er] work . . . would be a reason for the ALJ to discount the disabling nature of the problem, . . . ." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *see also Morrison v. Saul*, 2020 WL 1158480, at *5 (7th Cir. Mar. 10, 2020)(returning to work after three back surgeries was an adequate reason for ALJ to discount plaintiff's claim that impairments were disabling); *McHenry v. Berryhill*, 911 F.3d 866, 874 (7th Cir. 2018)(ability to cut hair contradicted plaintiff's account of the physical limitations caused by her back impairment) *Castile v. Astrue*, 617 F.3d 923, 928 (7th Cir. 2010)(ALJ properly considered that the plaintiff worked despite obesity and chronic fatigue for years). Plaintiff tells us that she really wasn't doing much when she was working. She worked only worked a five-hour shift, and was only on her feet for 3 to 3.5 hours. If she worked a 5 hour shift, she would be on her feet about 3 to 3.5 hours. When she had no customers, she would sit in an office during that shift. [Dkt. #16, at 9]; (R. 60-61). None of that conflicts with an ability to perform a *sedentary* job where one is not on their feet and can "sit in an office" all day long. After minimizing her work activity, plaintiff turns around and suggest her efforts were "dogged." [Dkt. #16, at 10]. As previously noted, the plaintiff's reasoning is often hard to follow.

She also finds fault for the ALJ noting that she cared for her boyfriend's mother, whom plaintiff said need constant care. (R. 907). Plaintiff is correct insofar as keeping up with

13

responsibilities at home cannot be equated with holding down a full-time job. *See Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020); *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). But, the ALJ did not necessarily equate daily activities with a capacity for full-time work. (R. 937, 946-47). The ability to take constant care of an enfeebled individual undermines the claim that one is so impaired she must remain in her room all day and could not even perform the sitting required of sedentary work. That type of activity may not prove one can do sedentary work, but it is not inconsistent with an ability to do sedentary work. Clearly, the ALJ was permitted to consider whether plaintiff's daily activities were inconsistent with alleged inability to work. See 20 C.F.R. § 404.1529(c)(3)(i); *Massaglia v. Saul*, 805 F. App'x 406, 410 (7th Cir. 2020); *Puchalski v. Colvin*, 651 F. App'x 535, 538 (7th Cir. 2016); *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013).

Plaintiff next complains that the ALJ failed to properly consider her respiratory issues and improperly considered her failure to follow medical advice as detracting from her claims. [Dkt. #16, at 10, 11-12]. Doctors repeatedly told plaintiff to quit smoking and, moreover, specifically linked it to the sinusitis that prevented her from using her CPAP machine, which in turn leads to her fatigue. This all certainly suggests that if she quit smoking, she would be restored to a non-severe condition. *See Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). In *Shramek*, because of the addictive nature of smoking, the Seventh Circuit cautioned ALJs against finding that a failure to give up smoking is evidence that the underlying condition is not painful or limiting. *Id.* As the court said, "[o]ne does not need to look far to see persons with emphysema or lung cancer—directly caused by smoking—who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop."

14

*Shramek*, 226 F.3d at 813. True enough, but – and this may draw fire from cat lovers – cats are not addictive. Plaintiff ignored doctors' advice about avoiding cats and other triggers for her respiratory condition. When one starts to consider all of plaintiff's excuses in combination, as the ALJ did, there have to be valid questions about how severe her impairments were when there were "free" things she was told she could do to improve her health.

In this regard, there is an overall logic to the ALJ's assessment that the plaintiff fails to see. She has a handful of problems: back pain, fatigue from sleeplessness, respiratory trouble. Each one is tied to the choices she makes. She has an excuse for why she has refused medical advice on each of those choices. Smoking is addictive. She bums two to three packs of cigarettes a day from her boyfriend and daughters, The cat is her boyfriend's. We don't know the reason for overeating, but it does not appear to be medical. She didn't do much at all when she was working, on the other hand her efforts were heroic. One or two excuses might fly, but the plaintiff presents a tapestry. We have no concerns with the ALJ pointing all this out and wondering, given all she continues to do, if plaintiff's symptoms are really as bad as she claims.

The ALJ also gauged plaintiff's complaints against the objective medical evidence. Oxyhemoglobin was good. Lumbar and cervical spinal studies were essentially normal with no more than mild degenerative changes. There were no reports of fatigue at examinations. Treatment was conservative. These are all valid reasons to find plaintiff's complaints to be exaggerated, as do the claims of pain. *See Atkins v. Saul*, 2020 WL 2554397, at *4 (7th Cir. May 20, 2020); *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (concluding it was appropriate for ALJ to consider objective evidence regarding claimant's pain alongside other factors, including claimant's activity levels); *Elder v. Berryhill*, 774 F. App'x 980, 983 (7th Cir. 2019); *Jones v. Astrue*, 623 F.3d 1155,

15

1161 (7th Cir. 2010)("discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." ).

The plaintiff next argues that the ALJ's reasoning for rejecting the opinions of her treating physicians was legally insufficient. [Dkt. #16, at 17-19]. The ALJ found that the opinions from plaintiff's two treating physicians were entitled to little or no weight because they were inconsistent with the medical record and unsupported by any clinical findings. (R. 945-46). Both are valid reasons for according little or no weight to a physician's opinion. *Vang v. Saul*, 805 F. App'x 398 (7th Cir. 2020); *Rockwell v. Saul*, 781 F. App'x 532, 537 (7th Cir. 2019); *Burmester*, 920 F.3d at 512; *Barrett v. Berryhill*, 904 F.3d 1029, 1032 (7th Cir. 2018); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

They are all the more valid in this case because it is clear from the forms the two doctors filled out at the plaintiff's attorney's request that they were both "bending over backwards" to support her claim for benefits. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir.2006) (stressing that, while treating physicians are often more familiar with the alleged impairments of social security claimants, they also may attempt to "bend over backwards" to assist patients in obtaining benefits); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir.1982). Indeed, the two opinions are so inherently unbelievable that making them the centerpiece of an argument in a brief is bordering on professional irresponsibility. The argument is another good example of why taking a blunderbuss approach to brief writing does little but undermine a party's entire case. Both doctors' opinions, essentially, portrayed plaintiff as what ALJs used to call a "dead claimant." *See Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Farley v. Berryhill*, 314 F. Supp. 3d 941, 948 (N.D. Ill. 2018); *West v. Colvin*, 2013 WL 3728807, at *14 (N.D. Ill. 2013). To be frank,

16

the court cannot take either doctor's opinion seriously, let alone begin to question the ALJ's rejection of them.

Dr. Ungar claimed that plaintiff could sit for no more than 20 minutes at a time, and for no more than a total 20 minutes in an eight-hour workday. She could neither stand nor walk for any length of time in a workday. When asked what the plaintiff did the rest of the day – seeing as the sit/stand/walk time fell far short of one hour, let alone eight hours – Dr. Ungar had no answer. (R. 888). Incredibly, a page or two later, the doctor decided plaintiff – who could neither walk nor stand at work, remember – could climb ladders, scaffolds, or stairs for up to 1/3 of every workday. (R. 890). Dr. Ungar then added that plaintiff could only tolerate an environment that was as quiet as a library, again providing no rationale for this restriction. (R. 890). In conclusion, when asked to list any other work-related restrictions and what evidence supported them, Dr. Ungar listed none, but wrote "EMG/CT findings" (R. 892). But those showed, at most, only mild changes with no herniation, stenosis or narrowing. (R. 838). There was nothing to support a restriction to 20 minutes of sitting and no standing or walking in an entire day. In short, the opinion was nonsense. The ALJ spent too much time with it and would have been right to just reject it out of hand.

Dr. Raghaveda's opinion is similarly suspect and unacceptable, altho it gives plaintiff a bit more ability. Here, the plaintiff is said to be able to sit for no more than an hour, total, in a day, and she could stand and walk for no more than a total of 30 minutes each. What she would do the other six hours is anyone's guess; although specifically asked, Dr. Raghaveda does not say. (R. 918). The doctor claimed the plaintiff was unable to read ordinary print; one has no idea why. (R. 920). Although asked repeatedly to identify any medical findings or impairments that would result in such significant limitations, the doctor was unable to do so. (R. 917-22). Again, the opinion is nonsense

17

and the ALJ did not err in rejecting it.

As noted, plaintiff's counsel would have the court believe that his client can stand and walk for a total of, at best two hours out of an eight-hour day. One supposes she is supine or prostrate for the remaining six, but plaintiff herself doesn't even claim that, and her activities, even if limited, belie such a claim. Counsel would do well to *carefully* review the opinions he procures from treating physicians before making them part of his brief in support of overturning an ALJ's decision.

That leaves a couple of additional arguments that plaintiff has buried at the end of her laundry list of grievances. One is that the plaintiff doesn't think the ALJ provided a basis for her to be able to do even sedentary work, which is performed mostly while sitting. [Dkt. # 16, at 21-22]. Sedentary work is the least demanding level of work. SSR 83–10, 1983 WL 31251, at *5–6; Thompson v. Colvin, 575 F. App'x 668, 677 (7th Cir. 2014). The plaintiff insinuates that her back and neck impairments make it impossible for her to sit all day at a job, even with breaks. But, as the ALJ noted, more than once, objective evidence of these impairments indicated they were mild. The ALJ also noted that plaintiff had been able to perform work that involved standing for 3 to 4 hours a day despite both her spine impairments and obesity. She sat at the job in an office to relieve discomfort from standing. And, she said sat all day in her room.

Finally, the plaintiff argues that because then Magistrate Judge Rowland previously found adequate record evidence to demonstrate the presence of mental impairments, the ALJ's characterization of the evidence as "unremarkable" violated the "law of the case doctrine. [Dkt. #26]. After discussing the evidence both from before and after the expiration of the plaintiff's insured status, the district court remanded because the ALJ failed to build a "logical bridge" from that evidence to her conclusion, and ordered the ALJ to consult a mental health expert to assess the

18

record on remand. (R. 1049). The ALJ did just that, and that expert, Dr. Atkins, found that, based on the medical evidence, plaintiff had no severe psychological impairment before the expiration of her insured status. (R. 934-35). The law of the case doctrine requires an administrative agency to "conform its further proceedings in the case to the principles set forth in the [appellate] decision." *Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020). It did so. There was no violation of the law of the case doctrine. The ALJ was not ordered to find a severe mental impairment or find the plaintiff had a disability. The ALJ did as she was instructed. It just didn't go the way the plaintiff had wanted.

Notably, the ALJ did not say there was no record of mental impairments this time around, or even that the evidence was "unremarkable." The ALJ engaged in a lengthy discussion of the psychological record and said it was sparse; there is no other way to describe it. (R. 93-934). Indeed, the bulk of the psychological evidence discussed in the previous opinion was from at least three months after plaintiff's insured status expired. (R. 1039-41). While evidence from after the expiration of insured status can be relevant to establish that an impairment existed prior to a claimant's DLI, *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353 (7th Cir. 2005), it does little to establish the severity or limitations stemming from such an impairment, especially when the medical findings and notes show it was mild and not disabling. And, as noted above, the ALJ did not ignore it; she clearly considered it and found it unpersuasive.

Prior to the expiration of her insured status, the plaintiff reported she was depressed once in June 2008, and was anxious once in November 2008 – both while she was working. (R. 1038). But there is no one who has not been depressed and/or anxious at various times in their life. However, "depression, the mental illness, differs substantially from 'depression' the common mental state." *Loveless v. Chater*, 97 F.3d 1454 (7th Cir. 1966). And not everyone who has experienced depression

or anxiety is disabled. Indeed, few such people are. *Willis v. Potter*, 2008 WL 821921 at *19 (N.D.Fla. 2008). Those notes make no mention of any accompanying limitations. The only mental status examination on record prior to the expiration of plaintiff's insured status, in December 2009, indicates that plaintiff was functioning essentially normally, aside from difficulty with serial 7s. (R. 1038). Her GAF score of 66 indicated she was functioning well with only mild symptoms. (R. 1038). In short, while there were two mentions of diagnoses of depression and anxiety disorder just prior to the expiration of plaintiff's insured status, there was nothing regarding resulting limitations. (R. 824 ("panic and anxiety disorder"), 849 (list of prescriptions), 862 ("referral for counseling")). But, diagnosis is not disability. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). What matters is the severity of the condition and how it limits plaintiff's capacity to work based on clinical and/or laboratory findings. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) ("... it makes no difference if [plaintiff] saw [his doctor] "every two-and-a-half months". . . what does matter is that [his doctor] did not confirm the severity of [plaintiff's impairment] with medical examinations or tests."). As the ALJ and a medical expert both said, there is no evidence that plaintiff's claimed depression and anxiety became disabling prior to the expiration of her insured status. At a certain point, there is simply nothing more an ALJ can do, and the court is not bound to accept the plaintiff's arguments against the ALJ's decision, especially when many of the former are based on a less than careful reading of the record and the ALJ's decision. After all, "unfortunately... saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010).

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for summary judgment [Dkt. # 24]

is granted, and the Commissioner's decision is affirmed.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/4/20

21